MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a corporation, Plaintiff,

v.

Sam GOLDMAN, Defendant.

No. 76–852C(1).

United States District Court, E. D. Missouri, E. D.

May 8, 1978.

Henry D. Menghini, Harvey G. Schneider, Evans & Dixon, St. Louis, Mo., for plaintiff.

Stuart J. Radloff, Friedman & Fredericks, Clayton, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, Chief Judge.

This matter was tried to the Court and the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Merrill Lynch, Pierce, Fenner & Smith, Inc., (Merrill Lynch) is a Delaware corporation, with its principal place of business in New York City, and licensed to do business in the State of Missouri. It is engaged in the business as a securities and commodities broker. Sam Goldman is a citizen of the State of Missouri. The amount in controversy exceeds $10,000. Jurisdiction diversity is alleged in the complaint. The counterclaim jurisdiction is based on the Commodity Exchange Act, 7 U.S.C. § 6b and 6o, the essence of which is that the plaintiff defrauded the defendant.

2. On or about May 4, 1976, defendant Sam Goldman went to the offices of Merrill Lynch in Clayton, Missouri, to inquire about investing in Mexican Peso Futures Contracts. He discussed this matter with Stephen Palmen, an account executive in the office. Mr. Palmen had no information about Mexican pesos and had never traded in Mexican Peso Futures. He so advised Mr. Goldman. Goldman brought with him to the office a copy of "McKeever's Multi-National Investment and Survival Letter" of March 9, 1976, which Palmen had never seen. This "Letter" discussed the large returns that could be made by investing in Mexican Peso Futures Contracts. Goldman left the Letter with Palmen. Palmen stated he would look into the matter.

3. The McKeever Letter listed two telephone numbers for Dick Joynes, president of Futures Investment Company, in California. In Goldman's presence, on May 4, 1976, Palmen called these two numbers and talked to someone who refused to provide any information concerning investment in the peso, unless Palmen subscribed to their advisory service, which Palmen declined to do.

4. At Goldman's request, Palmen requested an opinion from Merrill Lynch's foreign currency specialists in Chicago. These two specialists of Merrill Lynch were Chuck Dushek and Tully Davia. The specialists' opinion sent to Palmen by teletype was that the Mexican peso market was very erratic and speculative and made no recommendation and had no opinion on whether a client should get in or out of this market. The information was related by Palmen to Goldman by telephone on May 4, 1976.

5. Goldman was a lawyer and had practiced law in the St. Louis area for thirty years. At the time he first came to the office of Merrill Lynch, he had $120,000 invested in Mexican Savings and Loan Association certificates of deposit. This investment was made in 1972 and he had been earning ten or eleven percent interest since that time, which was a higher rate than was available on certificates of deposit in the United States. Goldman was a knowledgeable investor and was fully aware of the risk involved in trading in

Mexican Peso Futures Contracts. At the time Goldman first came to the office of Merrill Lynch, the peso was tied to a fixed rate of exchange of twelve and one-half pesos to the dollar, with one peso being worth eight cents.

6. The next day, May 5, 1976, Goldman returned to the office of Merrill Lynch and brought with him the New Account Information for Commodities Speculative Accounts card. Goldman indicated on this form that he had $500,000 in current stocks and commodities and that his net worth was two million dollars. He signed the necessary contracts required by the International Monetary Market of the Chicago Mercantile Exchange, of which Merrill Lynch is a member. He made a deposit of $7,000 with Merrill Lynch, which was later increased to $12,000.

7. The following futures contract orders to purchase pesos were made by Goldman for his account with Merrill Lynch.

| Date of Order | No. of Pesos | Contract Price Per Peso | Maturity Date of Contract |
|---|---|---|---|
| 5–6–76 | 1 million | .06883 | Dec. 14, 1976 |
| 5–12–76 | 1 million | .06885 | Dec. 14, 1976 |
| 6–18–76 | 1 million | .07675 | Sept. 14, 1976 |
| 7–2–76 | 1 million | .07784 | Sept. 14, 1976 |
| 8–11–76 | 1 million | .07765 | Dec. 14, 1976 |

8. Merrill Lynch placed a $50,000 maximum margin requirement on the Goldman account, based on the information provided in the New Account Information form provided by Goldman. The rule of thumb of Merrill Lynch was that a commodities trading account should be no more than ten percent of the customer's net worth figure. The $50,000 limit was a conservative figure, based on the information which Goldman had supplied to Merrill Lynch. At Merrill Lynch's request, a Hopper-Holmes credit check was run on Goldman, which indicated that his net worth was $470,000. This report was dated May 28, 1977.

9. On May 4, 1976, when Goldman first came to the office of Merrill Lynch, Palmen made an effort to interest Goldman in a $50,000 guided investment program. Under Merrill Lynch's guided investment program, the client would deposit $50,000 and the

brokerage house would buy and sell various stocks, bonds, and other investments. During the entire time that Goldman did business with Merrill Lynch, Palmen made an effort to sell this program to Goldman. Goldman was not interested in the program, but only in Mexican pesos.

10. In June of 1976, Goldman went to the Clayton Brokerage Company and called on Don Becker, a commodities broker. Goldman advised that he was interested in buying four or five peso futures contracts with the December 1977 maturity date. Becker told Goldman that the margin requirement would be $35,000. Goldman advised Becker that when the peso contracts reached a certain point to call him and he would buy some Mexican Peso Futures Contracts. Becker advised Goldman that futures contracts in pesos was a very risky place to be and that there had been a great deal of talk and rumor of devaluation of the peso.

11. On August 19, 1976, Goldman purchased through Don Becker, a December 1977 Peso Futures Contract. Goldman had previously discussed this matter with Palmen at Merrill Lynch and Palmen recommended he not buy the contract, because of the uncertainty of devaluation of the Mexican peso. Goldman sold the December 1977 Mexican Futures Contract on August 25, 1976, and made a profit of $935.00. During the month of August 1976, Goldman deposited $20,000 with the Clayton Brokerage Company to be used for trading in other commodities futures. He continued to trade with Clayton Brokerage in other futures commodities during the month of September 1976.

12. On May 12, 1976, Palmen obtained a McKeever report, dated May 4, 1976. The McKeever report stated that "rumors of devaluation are louder than ever" and that conservative investors should "stand aside . . . until we see what is going to happen." This report was sent by Palmen to Goldman. On May 21, 1976, Palmen observed an article in the "Wall Street Journal", of that date, which stated that the Mexican economy had serious problems

and that American investors were concerned over devaluation of the peso. Palmen sent this article to Goldman. Goldman read the article.

13. On August 22, 1976, Goldman could have sold his Mexican Peso Futures Contracts and realized a profit of $22,580. This he did not do. On August 31, 1976, the Government of Mexico announced that the peso would no longer be traded at a fixed rate of exchange with reference to the American dollar, but would be allowed to float free at such rate of exchange as the open market would determine. The Commodities Exchange closed for one week because of this announcement. On September 2, 1976, Merrill Lynch called upon Goldman to deposit an additional $125,000 margin, which he declined to do. Merrill Lynch, on September 8, 1976, pursuant to the Commodities Account Agreement signed by Goldman with them, sold Goldman's Peso Contracts at a loss to Merrill Lynch of $131,145, which Merrill Lynch paid. Deducting the $12,000 deposit which Goldman had with Merrill Lynch, Goldman is indebted to Merrill Lynch in the amount of $119,145, together with interest at the rate of six percent per annum from September 9, 1976.

14. Goldman's testimony of his dealings with Palmen is very different from the facts found by the Court.

### Conclusions of Law

1. This Court has jurisdiction by virtue of diversity of citizenship, 28 U.S.C. § 1332, and the Commodity Exchange Act, 7 U.S.C. § 6b and 6o.

2. The outcome of this case is determined to some extent by the credibility of the witnesses. When the Court considers the conduct of Goldman, his prior investment in Mexican pesos, the physical evidence of warnings given by Palmen to Goldman, which he admits receiving, the Court finds the plaintiff committed no fraud, no misrepresentation and no violation of the Securities Exchange Act.

3. Judgment will be rendered for the plaintiff, Merrill Lynch, and against the defendant, Goldman, on the complaint in the sum of $119,145, plus interest in the amount of six percent per annum from September 9, 1976. Judgment will be rendered against the defendant, Sam Goldman, on his counterclaim and in favor of the plaintiff, Merrill Lynch. The counterclaim will be dismissed with prejudice.